Slip Op. 12 - 100

UNITED STATES COURT OF INTERNATIONAL TRADE

```
GROBEST & I-MEI INDUSTRIAL
(VIETNAM) CO., LTD., et al.,

        Plaintiffs,

            v.

UNITED STATES,

        Defendant,

AD HOC SHRIMP TRADE ACTION
COMMITTEE, et al.,

        Defendant-Intervenors.
```

Before: Donald C. Pogue,
                 Chief Judge

Consol. Court No. 10-00238[1]

OPINION AND ORDER

[Affirming, in part, and remanding, in part, the Department of Commerce's Final Results of Redetermination Pursuant to Remand]

Dated: July 31, 2012

Matthew R. Nicely, David S. Christy, Jr., and David J. Townsend, Thompson Hine LLP, of Washington, DC, for the Plaintiffs Grobest & I-Mei Industrial (Vietnam) Co., Ltd.; Bac Lieu Fisheries Joint Stock Co.; C.P. Vietnam Livestock Corp.; Ca Mau Seafood Joint Stock Co.; Cadovimex Seafood Import-Export and Processing Joint-Stock Co.; Cafatex Fishery Joint Stock Corp.; Camau Frozen Seafood Processing Import Export Corp.; Cantho Import Export Fishery Ltd. Co.; Cuulong Seaproducts Co.; Danang Seaproducts Import Export Corp.; Investment Commerce Fisheries Corp.; Minh Hai Export Frozen Seafood Processing Joint-Stock Co.; Minh Hai Joint-Stock Seafoods Processing Co.; Minh Phat Seafood Co., Ltd.; Minh Phu Seafood Corp.; Minh Qui Seafood Co., Ltd.; Ngoc Sinh Private Enterprise; Nha Trang Fisheries Joint Stock Co.; Nha Trang Seaproduct Co.; Phu Cuong Seafood Processing & Import-Export Co., Ltd; Phuong Nam Co. Ltd.; Sao Ta Foods Joint Stock Co.; Soc Trang Seafood Joint Stock Co.; Thuan Phuoc Seafoods and Trading Corp.; UTXI Aquatic Products Processing

---

[1] This action is consolidated with Court Nos. 10-00253, 10-00257, 10-00265, 10-00272, and 10-00273. Order, Oct. 21, 2010, ECF No. 24.

Corp.; Viet Foods Co., Ltd.

        Robert G. Gosselink and Jonathan M. Freed, Trade
Pacific PLLC, of Washington, DC, for the Consolidated Plaintiffs
Cam Ranh Seafoods Processing Enterprise Co.; Contessa Premium
Foods Inc.; H&N Foods International.

        Adams C. Lee, Walter J. Spak, and Jay C. Campbell,
White & Case, LLP, of Washington, DC, for the Consolidated
Plaintiff Amanda Foods (Vietnam) Ltd.

        Joshua E. Kurland, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, DC, for Defendant United States.  With him on the
briefs were Stuart F. Delery, Acting Assistant Attorney General,
Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant
Director.  Of counsel on the briefs was Jonathan Zielinski,
Senior Attorney, Office of the Chief Counsel for Import
Administration, U.S. Department of Commerce, of Washington, DC.

        Andrew W. Kentz, Jordan C. Kahn, Nathaniel M. Rickard,
and Kevin M. O'Connor, Picard Kentz & Rowe LLP, of Washington,
DC, for Defendant-Intervenor Ad Hoc Shrimp Trade Action
Committee.

        Geert M. De Prest and Elizabeth J. Drake, Stewart &
Stewart, of Washington, DC, and Edward T. Hayes, Leake &
Andersson, LLP, of New Orleans, LA, for the Defendant-Intervenor
American Shrimp Processors Association.

        **Pogue, Chief Judge**: This case returns to court

following remand, by Grobest & I-Mei Indus. (Vietnam) Co. v.

United States, 36 CIT   , 815 F. Supp. 2d 1342 (2012) ("Grobest

I"), of the final results of the fourth administrative review of

the antidumping duty order on certain frozen warmwater shrimp

from the Socialist Republic of Vietnam.[2]  Specifically, Grobest I

_____

        [2] Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam, 75 Fed. Reg. 47,771 (Dep't Commerce Aug. 9,
2010) (final results and partial rescission of antidumping duty
administrative review) ("Final Results"), and accompanying Issues
                                        (footnote continued)

remanded the Final Results for the Department of Commerce

("Commerce" or "the Department") to (1) provide further

explanation or reconsider its policy of zeroing in administrative

reviews but not in investigations consistent with recent case law

from the Court of Appeals for the Federal Circuit; (2) reconsider

the request of Plaintiff Grobest & I-Mei Industrial (Vietnam)

Co., Ltd. ("Grobest") for individual review as a voluntary

respondent consistent with 19 U.S.C. § 1677m(a); and (3) accept

Amanda Foods' separate-rate certification and reconsider Amanda

Foods' duty rate. Grobest I, 36 CIT at    , 815 F. Supp. 2d at

1367–68. Upon remand, in the Final Results of Redetermination

Pursuant to Remand, A-552-802, ARP 08-09 (Apr. 30, 2012), Remand

R. Pub. Doc. 6 ("Remand Results"), Commerce (1) provided further

explanation to support its zeroing policy; (2) declined to

individually review Grobest as a voluntary respondent because

such review would be unduly burdensome and inhibit the timely

completion of the review; and (3) accepted Amanda Foods'

separate-rate certificate and assigned it the separate rate of

3.92%. Plaintiffs challenge the first and second determinations

in the Remand Results. For the reasons discussed below, the

court affirms the Remand Results on the first and third

---

[2](footnote continued)
& Decision Memorandum, A-552-802, ARP 08-09 (July 30, 2010),
Admin. R. Pub. Doc. 233, available at
http://ia.ita.doc.gov/frn/summary/VIETNAM/2010-19577-1.pdf ("I &
D Mem.") (adopted in Final Results, 75 Fed. Reg. at 47,772).

determinations, but remands again on the second.

      The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,[3] codified, as amended, at 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006) and 28 U.S.C. § 1581(c) (2006).

## STANDARD OF REVIEW

      "The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, 33 CIT   , 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

## DISCUSSION [4]

I.   Commerce's Policy of Zeroing in Administrative Reviews but Not in Investigations

   *A.   Background*

      In Grobest I, Plaintiffs challenged Commerce's policy of employing zeroing in administrative reviews but not in

---

[3] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

[4] Because Commerce's assignment of a separate rate to Amanda Foods is consistent with the remand order and is unchallenged, the court will affirm this determination without further discussion.

investigations.[5]  The court remanded the <u>Final Results</u> to

Commerce for reconsideration and redetermination consistent with

the Court of Appeals' holdings in <u>Dongbu Steel Co. v. United</u>

<u>States</u>, 635 F.3d 1363 (Fed. Cir. 2011) and <u>JTEKT Corp. v. United</u>

<u>States</u>, 642 F.3d 1378 (Fed. Cir. 2011). <u>Grobest I</u>, 36 CIT at    ,

815 F. Supp. 2d at 1350.  In <u>Dongbu</u>, the Court of Appeals held

that "the government has not pointed to any basis in the statute

for reading 19 U.S.C. § 1677(35) differently in administrative

reviews than in investigations. . . . In the absence of

sufficient reasons for interpreting the same statutory provision

inconsistently, Commerce's action is arbitrary." <u>Dongbu</u>, 635 F.3d

at 1372–73.  In <u>JTEKT</u>, Commerce attempted to comply with <u>Dongbu</u>

by pointing out that different methodologies are employed in

investigations and reviews.  The Court of Appeals rejected

Commerce's explanation as insufficient, stating:

> While Commerce did point to differences between
> investigations and administrative reviews, it failed to
> address the relevant question — why is it a reasonable
> interpretation of the statute to zero in administrative
> reviews, but not in investigations?  It is not
> illuminating to the continued practice of zeroing to
> know that one phase uses average-to-average comparisons
> while the other uses average-to-transaction
> comparisons.

---

[5] Familiarity with the court's prior opinion and the history
of the zeroing dispute outlined therein are presumed.  For
further discussion of the zeroing dispute and a detailed
explanation of the zeroing methodology, see the recent decision
in <u>Union Steel v. United States</u>, 36 CIT    , 823 F. Supp. 2d 1346
(2012).

JTEKT, 642 F.3d at 1384.  The issue now before the court is
whether Commerce's further explanation, as provided in the Remand
Results, is sufficient to satisfy the Court of Appeals' concerns
in Dongbu and JTEKT.

    *B.    Analysis*

        In the Remand Results, Commerce puts forward three
arguments to support its use of zeroing in reviews but not in
investigations.  First, Commerce argues that the courts have
previously affirmed the reasonableness of Commerce's current
review and investigation methodologies.  Second, Commerce argues
that the change of methodology in investigations was a reasonable
implementation of an adverse World Trade Organization ("WTO")
decision.  Finally, Commerce argues that its inconsistent
interpretations reasonably account for inherent differences
between investigations and reviews.

        Commerce contends that its first and second arguments
"sufficiently justify and explain why the Department reasonably
interpreted section [1677(35)] differently in average-to-average
comparisons in antidumping duty investigations relative to all
other contexts." Remand Results at 11.  However, contrary to
Commerce's assertion, in Dongbu the Court of Appeals held both of
these arguments insufficient to justify the inconsistent
interpretations.

        The Court of Appeals made clear in Dongbu that the

question before it — and therefore currently before this court — was novel: "Although we have considered Commerce's zeroing policy in administrative reviews on numerous occasions . . . we agree with [plaintiff] that this court has never addressed the reasonableness of Commerce's interpretation of 19 U.S.C. § 1677(35) with respect to administrative reviews now that Commerce is no longer using a consistent interpretation." Dongbu, 635 F.3d at 1371 (citations omitted); see also Union Steel, 36 CIT at    , 823 F. Supp. 2d at 1355-56. While the Court of Appeals has repeatedly affirmed the use of zeroing in administrative reviews, see, e.g., Timken Co. v. United States, 354 F.3d 1334, 1341-45 (Fed. Cir. 2004), and approved Commerce's decision to cease zeroing in investigations, see U.S. Steel Corp. v. United States, 621 F.3d 1351, 1360-63 (Fed. Cir. 2010), it has not addressed the question of inconsistent interpretations in prior cases. Therefore, that the Court of Appeals has "upheld the reasonableness of Commerce's changed methodology does not necessarily lead to the conclusion that Commerce's use of zeroing in administrative reviews remains reasonable." Dongbu, 635 F.3d at 1372 (responding to the claim that U.S. Steel Corp. stands for the proposition that the Court of Appeals has endorsed Commerce's divergent interpretations). Commerce cannot now rely on prior endorsements of its methodology when those cases did not address the relevant question before the court.

Nor does Commerce's proper implementation of an adverse WTO ruling resolve the question. Rather, recognizing that the Court of Appeals has upheld the new investigation methodology as a reasonable implementation of an adverse WTO ruling, U.S. Steel, 621 F.3d at 1360–63, Commerce must now show that its decision "compl[ies] with domestic law including reasonably interpreting statutes." Dongbu, 635 F.3d at 1372. A proper and reasonable implementation of an adverse WTO ruling may be contrary to law if it leads to an unreasonably inconsistent interpretation of statutory language. Id. ("[T]he government's decision to implement an adverse WTO report standing alone does not provide sufficient justification for the inconsistent statutory interpretations."). While implementation of an adverse WTO ruling may be a partial justification, it is not sufficient to resolve the matter. Union Steel, 36 CIT at    , 823 F. Supp. 2d at 1357–58.

Therefore, the court turns to Commerce's third argument, that the Department's interpretations of 19 U.S.C. § 1677(35) account for inherent differences between investigations and reviews. Commerce supports this argument in two ways. First, Commerce provides a detailed explanation of the methodological differences between the average-to-average comparison in investigations and the average-to-transaction approach taken in administrative reviews. Second, Commerce

Consol. Court No. 10-00238                              Page 9

explains why the goal of the investigation differs from the goal
of the administrative review.  Plaintiffs argue that this
reasoning does not satisfy the Court of Appeals' concerns in
Dongbu and JTEKT because it is not tied to the language of the
statute. Comments on Final Results of Redetermination Pursuant to
Court Remand at 7–9, ECF No. 116 ("Pls.' Comments").

          When considering whether Commerce's interpretation is
reasonable, the court looks first, but not exclusively, to the
language of the statute. See Chevron U.S.A., Inc. v. Natural Res.
Def. Council, Inc., 467 U.S. 837, 843 n.9 (1984); see also
Wheatland Tube Co. v. United States, 495 F.3d 1355, 1361 (Fed.
Cir. 2007) ("To determine whether Commerce's interpretation . . .
is reasonable, we may look to 'the express terms of the
provisions at issue, the objectives of those provisions, and the
objectives of the antidumping scheme as a whole.'" (quoting NSK
Ltd. v. United States, 26 CIT 650, 654, 217 F. Supp. 2d 1291,
1297 (2002))).  But, as the court pointed out in Union Steel,
this issue cannot be decided solely on the basis of the statutory
language found at § 1677(35)(A). Union Steel, 36 CIT at   , 823
F. Supp. 2d at 1356–57.  The statutory language (the word
"exceeds" in particular) has been repeatedly held ambiguous;
furthermore, it has been held to reasonably accommodate an
interpretation consistent with both zeroing and offsetting
methodologies.  Compare Timken, 354 F.3d at 1341–45, with U.S.

Steel, 621 F.3d at 1360-63.  What is at issue is not simply whether Commerce takes two different interpretations of § 1677(35)(A) in reviews and investigations; what is at issue is whether the statute can accommodate two different means to achieve two different ends.  Stated differently: is it reasonable under the statutory scheme as a whole for Commerce to employ a methodology incorporating zeroing in reviews but not in investigations?

To begin answering this question, we note that the statute distinguishes between "the amount by which normal value exceeds the export price or constructed export price," i.e., the dumping margin, and the manner in which this margin becomes the basis for the antidumping duty.  Section 1677(35)(A) defines a dumping margin as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."  Pursuant to 19 U.S.C. § 1673, if Commerce finds sales of subject merchandise at less than fair value and the International Trade Commission finds injury, then "there shall be imposed upon such merchandise an antidumping duty . . . in an amount equal to the amount by which the normal value exceeds the export price (or constructed export price) for the merchandise." Though a "dumping margin" and an "antidumping duty" are both measures of how much the normal value exceeds the export or constructed export price, § 1673 does not conflate the

antidumping duty with the dumping margin.  Rather, § 1673 contemplates a calculation methodology for arriving at the antidumping duty when it makes that duty "*an amount equal to the amount* by which normal value exceeds export price" (emphasis added).

However, the process by which a dumping margin becomes an antidumping duty is not provided by statute. See U.S. Steel, 621 F.3d at 1360.  What the statute does provide is the basis for an antidumping duty.  In some instances, the statute simply requires that the antidumping duty be based on the amount by which normal value exceeds export price. See 19 U.S.C. §§ 1673, 1673e(c)(3) ("[Commerce] shall publish notice in the Federal Register of the results of its determination of normal value and export price (or the constructed export price), and that determination shall be the basis for the assessment of antidumping duties . . . ."), 1675(a)(2)(C) ("The determination under this paragraph[6] shall be the basis for the assessment of . . . antidumping duties . . . and for deposits of estimated duties.").[7]  In other instances, the statute requires that an

---

[6] The referenced determination is found in 19 U.S.C. § 1675(a)(2)(A): "For the purpose of paragraph (1)(B), [Commerce] shall determine (i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry."

[7] Two prior opinions of this Court have discussed the definition of dumping margin as it appears in 19 U.S.C.
(footnote continued)

estimated antidumping duty be based on the weighted average

dumping margin, which, in turn, is based on the dumping margin,

see § 1677(35), also known as the amount by which normal value

exceeds export price.  See 19 U.S.C. § 1673b(d)(1)(B) (requiring

security in an amount based on the weighted average dumping

margin calculated for the preliminary determination); 19 U.S.C.

§ 1673d(c)(1)(B)(ii) (requiring security in an amount based on

the weighted average dumping margin calculated for the final

determination).  Thus, pursuant to statute, Commerce must

calculate the amount by which the normal value exceeds the export

price, i.e., the dumping margin, and this margin becomes the

basis for the antidumping duty.

          Prescribing that the dumping margin be the basis of the

antidumping duty does not tell Commerce how to translate a

dumping margin into an antidumping duty.  Commerce has reasonably

---

[7](footnote continued)
§ 1675(a)(2)(A). See Union Steel, 36 CIT at   , 823 F. Supp. 2d
at 1357 ("'[D]umping margin' is itself a very general term that
sometimes means 'dumping margin' as a comparison and sometimes
actually means 'weighted-average dumping margin' as a percentage
. . . ."); KYD, Inc. v. United States, 35 CIT   , 779 F. Supp. 2d
1361, 1368-69 (2011) ("'The term "dumping margin" means the
*amount* by which the normal value exceeds the export price or
constructed export price of the subject merchandise.' 19 U.S.C.
§ 1677(35)(A) (emphasis added)"); Kyd, at 1370 n.8.  While these
two opinions may, perhaps, be read to interpret § 1675(a)(2)(A)
slightly differently, any such conflict is irrelevant to the
zeroing issue.  As discussed elsewhere in this opinion, it is the
process by which a dumping margin becomes a dumping duty that is
relevant and neither Union Steel nor Kyd is in conflict with the
other or with this opinion on this issue.

interpreted the various provisions to involve a three-step

calculation: (1) calculation of a dumping margin; (2) calculation

of a weighted average dumping margin; and (3) application of the

weighted average dumping margin to sales or entries to determine

the cash deposit or antidumping duty.[8] See Union Steel, 36 CIT

at   , 823 F. Supp. 2d at 1349-50, app.  Therefore, the

§ 1677(35)(A) dumping margin serves as the basis for a

§ 1677(35)(B) weighted average dumping margin, and the weighted

average dumping margin serves as the basis for the antidumping

duty or estimated antidumping duty.[9]

          Where, then, does zeroing come into the calculation

methodology?  As the Court of Appeals has held, the statute

---

[8] The Court of Appeals noted in Koyo Seiko Co. v. United
States, 258 F.3d 1340, 1342 (Fed. Cir. 2001), that "Commerce has
adopted two different calculational approaches — one for cash
deposits and one for final duties."  However, the difference in
the approaches is that "the formula for cash deposit rates uses
*sales* during the review period as the denominator; the formula
for the final duty uses *imports* as the denominator." Id. at 1343.
The formulas, however, are the same in form and bear the same
relation to the dumping margin and weighted average dumping
margin.

[9] In this regard, it is worth noting that neither normal
value nor export price are constant values.  Both fluctuate over
the periods of review or investigation and also vary within the
various forms of the subject merchandise.  Consequently, for
these pricing values to result in a manageable assessment rate,
Commerce must further treat the data.  Such considerations lend
further support to the necessity of Commerce developing a
methodology for translating dumping margins into antidumping
duties and give lie to the notion that a § 1677(35)(A) dumping
margin is a sufficient basis upon which to assess an antidumping
duty.

neither requires nor forbids it at any step in the process. U.S.

Steel, 621 F.3d at 1361 ("[Section] 1677(35)(A) does not

unambiguously preclude — or require — Commerce to use zeroing

methodology."). Commerce explains in the Remand Results:

> When using an average-to-average comparison
> methodology, the Department usually divides the export
> transactions into groups, by model and level of trade
> (averaging groups), and compares an average export
> price or constructed export price of transactions
> within one averaging group to an average normal value
> for the comparable model of the foreign like product at
> the same or most similar level of trade. . . . The
> Department then compares the average export price or
> constructed export price for the averaging group with
> the average normal value for the comparable
> merchandise. This comparison yields an average amount
> of dumping for the particular averaging group because
> the high and low prices within the group have been
> averaged together prior to the comparison.
> Importantly, under this comparison methodology, the
> Department does not calculate the extent to which an
> exporter or producer dumped a particular sale . . . but
> rather makes the determination "on average" for the
> averaging group within which higher prices and lower
> prices offset each other. The Department then
> aggregates the results from each of the averaging
> groups to determine the aggregate dumping margins for a
> specific producer or exporter. At this aggregation
> stage, negative averaging group comparison results
> offset positive averaging group comparison
> results. . . .
>           . . . . Under the average-to-transaction
> comparison methodology, the Department compares the
> export price or constructed export price for a
> particular U.S. transaction with the average normal
> value for the comparable model of foreign like product.
> . . . The result of such a comparison evinces the
> amount, if any, by which the exporter or producer sold
> the merchandise at an export price less than its normal
> value. The Department then aggregates the results of
> these comparisons — *i.e.*, the amount of dumping found
> for each individual sale — to calculate the weighted-
> average dumping margin for the period of review. To
> the extent the average normal value does not exceed the

individual export price or constructed export price of a particular U.S. sale, the Department does not calculate a dumping margin for that sale or include an amount of dumping for that sale in its aggregation of transaction-specific dumping margins.

Remand Results at 12–14.

Pursuant to both methodologies, Commerce calculates the § 1677(35)(A) dumping margin by subtracting the export price from normal value for each averaging group. Once a dumping margin has been established, Commerce aggregates these dumping margins to determine a weighted average dumping margin. In an investigation, Commerce aggregates all of the dumping margins to determine "overall pricing behavior." Remand Results at 14. In a review, Commerce zeros negative margins prior to aggregation to arrive at a more accurate margin and to uncover masked dumping. Id. at 7, 14. Thus, "Commerce is not reading 'exceeds' to mean two things. It is reading it as basically irrelevant to the calculation methodology, whether it expresses its view in that manner or not." Union Steel, 36 CIT at    , 823 F. Supp. 2d at 1357.

Rather than reading "exceeds" in § 1677(35)(A) inconsistently, Commerce adopts two different methodologies for translating the dumping margin into an antidumping duty. In investigations, Commerce adopts a methodology intended to capture overall pricing behavior for the purpose of determining who should and should not fall within the purview of the antidumping

duty order; for this purpose, Commerce allows negative margins to offset positive margins.  In administrative reviews, however, Commerce has determined that a methodology that establishes the antidumping duty with greater accuracy is warranted both because the importer must actually pay the resulting antidumping duty and because it serves to uncover masked dumping[10]; for this purpose, Commerce zeroes negative dumping margins.

Commerce has offered a reasonable basis for treating investigations and reviews differently. See Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1379-80 (Fed. Cir. 2001) (requiring agency to provide reasonable explanation for treating the same language in two statutory provisions differently).  This reasoning is based in part on the antidumping statute's objective of determining margins as accurately as possible, Rhone Poulenc, Inc. v. United

---

[10] Plaintiffs argue that Commerce cannot rely on this reasoning because it has repudiated the necessity of zeroing as a measure to counteract masked and targeted dumping in its recent decision to cease zeroing in reviews. Pls.' Comments at 10-11 (citing Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8101, 8104 (Feb. 14, 2012).  Plaintiffs did not raise this argument before Commerce. See Comments on Draft Results of Redetermination Pursuant to Court Remand, A-552-802, ARP 08-09 (Apr. 5, 2012), Remand R. Pub. Doc. 3.  Because Plaintiffs failed to raise this argument before the Department, the court will not now consider it. See 28 U.S.C. § 2637(d) (2006); Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003) ("In the Court of International Trade, a plaintiff must show that it exhausted its administrative remedies, or that it qualifies for an exception to the exhaustion doctrine.").

States, 899 F.2d 1185, 1191 (Fed. Cir. 1990), in order to remedy the effect of unfair trading practices, Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103-04 (Fed. Cir. 1990).  Such is the basis behind seeking accuracy through zeroing in administrative reviews.  Commerce's reasoning is also based on its decision to implement an adverse WTO decision regarding investigations, which was properly done consistent with Commerce's authority and has been upheld as reasonable by the Court of Appeals.  While implementation of an adverse WTO determination is not a sufficient basis for an inconsistent interpretation of a statute, as noted above, it is a reasonable basis for the Department to reconsider the purpose, and therefore methodology, of an antidumping investigation, i.e., a reasonable basis for departing from its prior position.

Thus, the court agrees with the recent decision in Union Steel that "when it comes to reviews, which are intended to more accurately reflect commercial reality, Commerce is permitted to unmask dumping behavior in a way that is not necessary at the investigation stage." Union Steel, 36 CIT at   , 823 F. Supp. 2d at 1359.  Commerce's decision to adjust its methodology to seek overall pricing behavior in investigations and more accurate duties in reviews, by zeroing in reviews but not in investigations, is a reasonable interpretation of the statute. Because Commerce has reasonably interpreted the statute, its

explanation for zeroing in administrative reviews but not in

investigations is affirmed.

II.  Individual Review of Grobest as a Voluntary Respondent

     *A.  Background*

          In the Final Results, Commerce denied a revocation

request from Plaintiff Grobest because Grobest was not

individually reviewed.  In Grobest I, Grobest challenged this

determination, arguing, *inter alia*, that it should have been

reviewed as a voluntary respondent pursuant to 19 U.S.C.

§ 1677m(a).[11]  The court found that Commerce had failed to apply

the § 1677m(a) standard when it denied Grobest's request for

voluntary respondent status but had, instead, improperly applied

the § 1677f-1(c)(2) standard for choosing mandatory respondents.

Grobest I, 36 CIT at   , 815 F. Supp. 2d at 1362-63.  Therefore,

---

[11] Section 1677m(a) reads in relevant part:

In . . . a review under section 1675(a) of this title
in which [Commerce] has, under section 1677f-1(c)(2) of
this title . . . limited the number of exporters or
producers examined  . . . [Commerce] shall establish
. . . an individual weighted average dumping margin for
any exporter or producer not initially selected for
individual examination . . . who submits to [Commerce]
the information requested from exporters or producers
selected for examination, if (1) such information is so
submitted by the date specified (A) for exporters and
producers that were initially selected for examination
. . . and (2) the number of exporters or producers who
have submitted such information is not so large that
individual examination of such exporters or producers
would be unduly burdensome and inhibit the timely
completion of the investigation.

the court remanded this challenge to Commerce to evaluate

Grobest's request for voluntary respondent status consistent with

the standard set forth in § 1677m(a). Id. at 1364.

   *B.    Analysis*

      In the Remand Results, Commerce again rejected

Grobest's request for voluntary respondent status.  On remand,

Commerce determined that individual review of Grobest "would have

been unduly burdensome and inhibited the timely completion of the

review." Remand Results at 15.  Commerce first contends that the

workload in this case along with the workload in other

antidumping and countervailing duty cases handled by the office

in charge of this case made individual review of Grobest unduly

burdensome.  Second, Commerce contends that having fully extended

the time for the preliminary results and partially extended the

time for the final results, it could not individually review

Grobest without rendering completion of the administrative review

untimely.

      Grobest challenges the Remand Results as an

unreasonable interpretation of § 1677m(a).  In particular,

Grobest contends that "the Department says that even one company

can be a 'large' number under the statute.  This reading of the

statute ignores [the plain language of the provision in] that the

term 'so large' refers to a 'number' not a description of the

respondents." Pls.' Comments at 16 (citations omitted).

Therefore, according to Grobest, Commerce cannot refuse to individually review one or two voluntary respondents because these are not "large numbers." Id. at 16-17.

It is not the role of the court to second guess Commerce's allocation of its resources. See Longkou Haimeng Mach. Co. v. United States, 32 CIT 1142, 1151, 581 F. Supp. 2d 1344, 1353 (2008). "[A]ny assessment of Commerce's operational capabilities or deadline rendering must be made by the agency itself." Id.; see also Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995) ("[A]gencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources."). Because allocation of resources is committed to the sound discretion of the agency, so long as Commerce complies with statutory requirements the court reviews its allocation decision for abuse of discretion, i.e., "whether Commerce's decision was 'based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" Torrington, 68 F.3d at 1351 (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)).

Insofar as Grobest challenges Commerce's interpretation of the statute pursuant to the initial step in the Chevron framework, its argument is unavailing. Contrary to Grobest's assertion, the statute does not unambiguously define "a number so large." Rather, the statute conditions consideration of "a

number so large" on whether review of such a number of respondents would be unduly burdensome and inhibit the timely completion of the review.  The fact that the statute sets out a standard for interpreting "a number so large" means that there is no definitive number contemplated under the statute.  Rather, "number" and "large" are ambiguous statutory terms; thus, the court must consider whether Commerce's interpretation is reasonable. Chevron, 467 U.S. at 842–45.

        In the Remand Results, Commerce chose to examine the burden imposed and the effect upon the timeliness of the review posed by individual investigation of one voluntary respondent. In doing so, Commerce interpreted the statute not to set a floor for the number of voluntary respondents to be reviewed; rather, Commerce interpreted the statute to render every voluntary respondent request subject to an undue burden and timely completion analysis.  Such interpretation is reasonable as it contemplates the standard set forth by the statute itself — whether the number of respondents is so large as to be unduly burdensome and inhibit the timely completion of the review. Cf. F.C.C. v. AT&T Inc., 131 S. Ct. 1177, 1184 (2011) ("[S]tatutory interpretation turns on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (quoting Nken v. Holder, 556 U.S. 418, 426 (2009) (internal quotation marks omitted)).  In contrast,

Grobest's argument that the number of voluntary respondents must reach some arbitrary threshold of largeness fails to consider the relative burdens that may be imposed by review of any one respondent, thereby disregarding the statutorily established standard.

Having considered whether Commerce's statutory interpretation is reasonable, we must now consider whether Commerce's decision amounted to an abuse of discretion.  The Court of Appeals has stated that "an agency abuses its discretion where its 'decision (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the [agency] could rationally base its decision." Sterling Fed. Sys., Inc. v. Goldin, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting Gerritsen v. Shirai, 979 F.2d 1524, 1529 (Fed. Cir. 1992)); see also Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1148-49 (Fed. Cir. 2011) (noting that a clear error of judgment occurs when an action is "arbitrary, fanciful or clearly unreasonable").  When the record cannot support the agency's determination or the agency's exercise of discretion exceeds the limits of the statute, the agency has abused its discretion.

As we explained in Grobest I, § 1677m(a) sets a heightened standard that Commerce must meet when denying

individual review to a voluntary respondent. See Grobest I, 36 CIT at    , 815 F. Supp. 2d at 1363.  That heightened standard anticipates voluntary respondents placing some burden on the agency and requires that the voluntary respondents receive an individual review in those circumstances.  Such an expectation was contemplated by Congress when it noted in the Statement of Administrative Action for the Uruguay Rounds Agreements Act that "Commerce, consistent with Article 6.10.2 of the Agreement, will not discourage voluntary responses and will endeavor to investigate all firms that voluntarily provide timely responses in the form required . . . ." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201 ("SAA").  If this were not the case, then no analysis beyond that required in § 1677f-1(c)(2) would be required. Cf. Grobest I, 36 CIT at    , 815 F. Supp. 2d at 1362 ("To limit voluntary respondents through § 1677f-1(c)(2) is to foreclose review under § 1677m(a) barring the unexpected and irregular.").  We held in Grobest I that the agency cannot make a voluntary respondent decision based on its analysis pursuant to § 1677f-1(c)(2); likewise, the agency cannot draw its § 1677m(a) analysis so narrowly that it mirrors the analysis under § 1677f-1(c)(2).  It is only when the burden becomes *undue* that Commerce may decline to individually review voluntary respondents.

In this case Commerce has failed to show undue burden and has exercised its discretion in a way that renders the statute meaningless. On remand, Commerce found individual review of one voluntary respondent to be unduly burdensome. However, the facts that Commerce put forward to support that conclusion do not distinguish this case from the paradigmatic review of an antidumping or countervailing duty order.[12] Rather, the burdens Commerce names in the Remand Results are the same burdens that

---

[12] Commerce asserts the following facts to support its determination that review of Grobest would be unduly burdensome: The voluntary respondent materials are voluminous, require careful examination of each response, and are likely to require supplemental questionnaires. Remand Results at 15-16. Prior experience examining the mandatory respondent Minh Phu Group required four supplemental questionnaires, six deadline extensions, and an analysis of both export and constructed export price. Id. at 16. The second mandatory respondent, Nha Trang, had not been reviewed previously and the Department expected to expend significant resources reviewing Nha Trang for the first time. Id. at 16-17. The Department's prior experience reviewing Grobest led it to believe that a review of Grobest would require a "thorough examination likely involving several supplemental questionnaires," because the prior review of Grobest required four supplemental questionnaires and four extensions of time. Id. at 17. Commerce initiated a new shipper review of Nhat Duc Co., Ltd. on March 26, 2009. Id. The Department, and specifically AD/CVD Operations Office 9, was concurrently involved in ten administrative reviews and two investigations with overlapping deadlines. Id. at 17-18. High workloads throughout the Import Administration prevented reallocation of resources to Operations Office 9. Id. at 18. The review of Minh Phu Group and Nha Trang required seven supplemental questionnaires resulting in 4,535 pages and sixteen databases requiring analysis. Id. at 19. Analysis of the factors of production in shrimp cases require more time consuming review because the subject merchandise is valued based on count size. Id. at 32. The Department fully extended the deadlines for the Preliminary Results and partially extended the deadlines for the Final Results. Id. at 19-20.

occur in every review.  In this regard, Commerce's decision that the burden in this case is undue sets the bar for undue burden too low because it would make individual review of voluntary respondents in any typical antidumping or countervailing duty review unduly burdensome, and such a determination renders § 1677m(a) meaningless. Cf. Grobest I, 36 CIT at   , 815 F. Supp. 2d at 1363; see also SAA, vol. 1 at 873, 1994 U.S.C.C.A.N. at 4201.

When Commerce can show that the burden of reviewing a voluntary respondent would exceed that presented in the typical antidumping or countervailing duty review, the court will not second guess Commerce's decision on how to allocate its resources. See Longkou Haimeng Mach., 32 CIT at 1151, 581 F. Supp. 2d at 1353.  However, Commerce's failure to make such a showing in this case, thereby rendering § 1677m(a) meaningless, is an abuse of discretion.  Therefore, this case is remanded to Commerce to individually review Grobest as a voluntary respondent and, if appropriate in light of the review, to consider Grobest's request for revocation.

## CONCLUSION

In light of the foregoing opinion, the Final Results, 75 Fed. Reg. at 47,771, as explained by the Remand Results, are affirmed in part and remanded in part.  Commerce's explanation

for why it continued to zero in this review after ceasing zeroing in investigations is affirmed.  Commerce's assignment of the separate rate to Amanda Foods is also affirmed.  Commerce's rejection of Grobest's request for voluntary respondent status is remanded to Commerce to conduct an individual review of Grobest as a voluntary respondent and to reconsider Grobest's revocation request in light of the results of that review.

Commerce shall have until September 14, 2012, to complete and file its remand redetermination.  Plaintiffs and Defendant-Intervenors shall have until September 28, 2012, to file comments.  Plaintiffs, Defendant, and Defendant-Intervenors shall have until October 8, 2012, to file any reply.

It is **SO ORDERED**.

_/s/ Donald C. Pogue_
Donald C. Pogue, Chief Judge

Dated: July 31, 2012
    New York, New York