# United States Court of Appeals for the Federal Circuit

---

**PAPIERFABRIK AUGUST KOEHLER SE,**
*Plaintiff-Appellant*

v.

**UNITED STATES, APPVION, INC.,**
*Defendants-Appellees*

---

2015-1489

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00163-NT, Senior Judge Nicholas Tsoucalas.

---

Decided: December 16, 2016

---

JOHN F. WOOD, Hughes Hubbard & Reed LLP, Washington, DC, argued for plaintiff-appellant. Also represented by FLORA AMANDA DEBUSK, LYNN KAMARCK, MATTHEW R. NICELY, ERIC S. PARNES, DANIEL MARTIN WITKOWSKI.

JOSHUA E. KURLAND, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, REGINALD T. BLADES, JR.; JESSICA M. LINK, Office of the Chief Counsel for Trade Enforcement &

Compliance, United States Department of Commerce, Washington, DC.

DANIEL SCHNEIDERMAN, King & Spalding LLP, Washington, DC, argued for defendant-appellee Appvion, Inc. Also represented by GILBERT B. KAPLAN, STEPHEN A. JONES.

———————————

Before TARANTO, CHEN, and STOLL, *Circuit Judges.*

TARANTO, *Circuit Judge.*

This case involves the U.S. Department of Commerce's review of imports of lightweight thermal paper from Germany between November 1, 2010, and October 31, 2011, the third year covered by an applicable anti-dumping duty order. In the review, the German firm Papierfabrik August Koehler SE (Koehler) was the only respondent. Commerce discovered midway through the review that Koehler had engaged in a scheme resulting in the omission of some German-market sales from the information Koehler had supplied to Commerce, thereby altering the home-market prices that are compared to U.S. prices to measure the dumping margin. Because of that misconduct, Commerce deemed Koehler's data unreliable and made adverse inferences against Koehler. Commerce adopted the highest dumping margin cited in the petition that launched the original investigation, relying for corroboration on sales data Koehler had submitted in the second-year review. *See* Lightweight Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 23,220 (Dep't of Commerce Apr. 18, 2013). The Court of International Trade approved Commerce's determination. *Papierfabrik August Koehler S.E. v. United States*, 7 F. Supp. 3d 1304 (Ct. Int'l Trade 2014), *motion to amend the judgment denied*, 44 F. Supp. 3d 1356 (Ct. Int'l Trade

2015).  Concluding that Commerce permissibly exercised its considerable discretion, we affirm.

I

Acting under 19 U.S.C. § 1675, in response to the request of Appvion, Inc. (formerly known as Appleton Papers, Inc.), Commerce initiated this third administrative review of its antidumping duty order covering lightweight thermal paper from Germany on December 30, 2011.  Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 76 Fed. Reg. 82,268 (Dep't of Commerce Dec. 30, 2011).  Koehler responded to Section A of Commerce's antidumping questionnaire on February 21, 2012, and Sections B and C on their due date, February 27, 2012.  Koehler's responses included aggregate information about the quantity and value of Koehler's home-market sales, as well as a database of information about individual home-market sales transactions.  Due to "questions which ha[d] not been answered adequately, and areas where clarification of the submitted information [was] required," Commerce issued a supplemental questionnaire on May 16, 2012.  J.A. 489–94.  On May 18, 2012, Appvion filed an affidavit from a confidential source asserting that Koehler was engaged in a transshipment scheme, whereby it was shipping goods destined for its home market through other markets so that those sales would not be reported as home-market sales to Commerce.  Appvion also placed on the record certain sales data submitted by Koehler in the second administrative review (covering November 1, 2009, to October 31, 2010).

Koehler requested two extensions of time to respond to the May 16 supplemental questionnaire.  On May 24, 2012, Koehler sought a two-week extension due to the temporary absence of key personnel, the time required to translate documents, and the difficulty of reviewing the many documents involved.  Commerce granted that

extension due to the "unique circumstances." On June 4, 2012, Koehler sought a further three-week extension to respond to the supplemental questionnaire and to allow outside counsel to investigate the transshipment allegations. Commerce agreed in part, again citing "unique circumstances."

Koehler finally responded to the supplemental questionnaire on June 27, 2012, the new deadline. Along with its response, Koehler admitted that its employees had knowingly transshipped certain orders that should have been reported as home-market sales, and it proffered an updated home-market sales database that it alleged included those sales. Although Commerce accepted the supplemental questionnaire responses and allowed Koehler to correct some inadvertent errors in the originally submitted home-market data, it refused to accept the updated home-market sales data that included the omitted, transshipped sales. Commerce explained that the supplemental questionnaire had requested only clarification, not new data; that Koehler's new data was untimely; and that Koehler had not shown good cause for extending the deadline for data submission.

Commerce published its preliminary results on December 11, 2012, Lightweight Thermal Paper From Germany; Preliminary Results of Antidumping Duty Administrative Review; 2010–2011, 77 Fed. Reg. 73,615 (Dep't of Commerce Dec. 11, 2012), and its final results on April 18, 2013, Lightweight Thermal Paper from Germany: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 23,220 (Dep't of Commerce Apr. 18, 2013). In its April 10 Issues and Decision Memorandum accompanying the final results, Commerce found that Koehler had withheld information, failed to provide information in a timely manner, significantly impeded the proceeding, and provided information that could not be verified, and that Koehler also had failed to cooperate to the best of its ability. J.A. 1935–36. On

those bases, Commerce invoked its authority under 19 U.S.C. § 1677e(a) and (b), *see* Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 868–70 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, 4198–99 (deemed "authoritative" by 19 U.S.C. § 3512(d)), and concluded that it would draw inferences adverse to Koehler. J.A. 1935–36.

With respect to the data that Koehler timely submitted, Commerce found that "[t]he extent of Koehler's material misrepresentation in this case rendered Koehler's questionnaire responses wholly unreliable and unusable." J.A. 1937. While Commerce acknowledged that "Koehler took certain measures after the allegation was made by Petitioner and acknowledged by Koehler," it "d[id] not find that such actions taken by Koehler restore[d] [its] confidence in the reliability of [Koehler's] home market sales data submitted for this review, especially given the extent of the fraudulent activity involved in this transshipment scheme." J.A. 1942. Commerce also noted that "Koehler did not reveal its transshipment scheme voluntarily; it did so only after [Appvion's] May 18, 2012, allegation" and that it "believe[d] it unlikely that Koehler would have provided information about the transshipment scheme and the omitted sales were it not for [Appvion's] allegation." J.A. 1941.

Having rejected Koehler's timely-submitted data, Commerce chose to adopt, as the dumping margin it would apply to Koehler, the highest margin rate alleged in Appvion's petition, 75.36%. *See* 19 U.S.C. § 1677e(b)(1) (2012) ("an adverse inference may include reliance on information derived from . . . the petition"). Commerce then found corroboration for that figure in the fact that it fell within the range of transaction-specific margins calculated from data Koehler had submitted in the second administrative review, where the margins ranged from less than zero to 144.63%. *See id.* § 1677e(c) (providing that for "secondary information" like Appvion's petition,

Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal").

Commerce explained that 19 U.S.C. § 1677m(e) did not require Commerce to consider the updated information that Koehler tried to submit. It found multiple reasons for that provision's inapplicability: first, Koehler had not "submitted [that data] by the deadline"; second, the data could not be "verified"; and third, Koehler had not "demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by" Commerce. *Id.* § 1677m(e)(1), (2), (4). Commerce also explained that it was not obligated to accept Koehler's late-filed updated data under § 1677m(d), which provides that Commerce in certain circumstances shall permit a person "to remedy or explain" a "deficiency." Commerce noted that Koehler's "deficiency" was not due to an error or misunderstanding, but to intentional misconduct, which Commerce gave Koehler an opportunity to explain.

On April 24, 2013, Koehler filed a complaint with the Court of International Trade to challenge Commerce's final results. On December 6, 2013, Koehler moved for judgment on the agency record pursuant to Court of International Trade Rule 56.2, which permits the court to enter a final judgment for either party without a trial. Ct. of Int'l Trade R. 56.2(b) ("If the court determines that judgment should be entered in an opposing party's favor, it may enter judgment in that party's favor, notwithstanding the absence of a cross-motion."). The court sustained Commerce's determination and entered judgment for Commerce on September 3, 2014. *Papierfabrik August Koehler*, 7 F. Supp. 3d at 1318. Koehler moved to amend the judgment on October 3, 2014. The court denied the motion on January 20, 2015. *Papierfabrik August Koehler*, 44 F. Supp. 3d at 1359.

Koehler appeals. It challenges (1) Commerce's decision to disregard its original home-market data; (2) Commerce's corroboration of the 75.36% figure; and (3) Commerce's refusal to allow Koehler to submit updated data after the fact-submission deadline, which was the date on which Appvion notified Commerce of Koehler's transshipment scheme. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II

We review Commerce's determinations applying the same standard to Commerce's actions that the Court of International Trade applies. *Apex Exports v. United States*, 777 F.3d 1373, 1377 (Fed. Cir. 2015). Commerce's decision is reviewed here to determine if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## A

We see no reversible error in Commerce's determination to draw adverse inferences as to Koehler without relying on Koehler's original, incorrect home-sales data.

Where "an interested party . . . withholds information that has been requested," "fails to provide such information by the deadlines for submission of the information," "significantly impedes a proceeding," or "provides such information but the information cannot be verified," Commerce may use the facts that are "otherwise available" to it to calculate an antidumping margin. 19 U.S.C. § 1677e(a). If, in addition, Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). The best-of-one's-ability standard "does not require perfection and recognizes that mistakes some-

times occur," but "it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The standard expects respondents to "(a) take reasonable steps to keep and maintain full and complete records . . . ; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question." *Id.*

Here, substantial evidence supports Commerce's decision to apply § 1677e(a). There is substantial evidence that Koehler engaged in an intentional transshipment scheme that caused it to withhold certain home-sales information from its responses to Commerce, an omission that impeded the investigation, and that it offered updated information only after the deadline for submitting data. Commerce could properly find one or more of the conditions stated in § 1677e(a) satisfied in this case.

Substantial evidence likewise supports Commerce's decision to apply § 1677e(b). There is substantial evidence that Koehler did not cooperate to the best of its ability. The kind of misconduct evidenced here is far from the cooperation that standard demands. *See Nippon Steel*, 337 F.3d at 1382. Koehler attempts to pin the misconduct on a few errant employees. But Commerce could find that Koehler is responsible for the conduct of its employees and for the responses it provided to Commerce. Indeed, Koehler and its outside counsel certified the accuracy and completeness of the original responses. Thus, Commerce was entitled to make adverse inferences.

Commerce could also determine that Koehler's misconduct with respect to its home-market sales undermined the reliability of its original data, so that Commerce could disregard it as evidence of the lower dumping margins Koehler urged, rather than undertake

new inquiries to determine how to arrive at correct data. We have held that fraudulent responses as to part of submitted data may suffice to support a refusal by Commerce to rely on any of that data in calculating the antidumping duty. *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1355–57 (Fed. Cir. 2015) (approving a finding that the respondent's credibility was "impeach[ed] . . . as a consequence of evidence reasonably indicating that [the respondent] deliberately withheld and misrepresented information, and these misrepresentations may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented" (internal quotation marks omitted) (quoting *Ad Hoc Shrimp Trade Action Comm. v. United States*, 992 F. Supp. 2d 1285, 1293 (Ct. Int'l Trade 2014))). Koehler has not persuasively shown why Commerce could not take that approach in the circumstances of this case, where Commerce reasonably found that Koehler intentionally submitted materially false responses. Thus, Commerce could, in this case, find none of Koehler's original home-market sales data so "reliable or usable" as to block an otherwise-permissible adverse inference. *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011).

B

We see no reversible error in Commerce's adoption of a 75.36% rate from Appvion's petition, which Commerce sufficiently corroborated using Koehler's own data (which it could assume was not skewed *against* Koehler).

Under 19 U.S.C. § 1677e(b)(1) (2012), "the petition" is one source of information Commerce may tap when drawing an adverse inference under § 1677e(b). The statute thus expressly permitted Commerce to turn to Appvion's petition, and that authorization does not exclude petition numbers that are based on information other than the (uncooperative) respondent's own sales. Indeed, Com-

merce asserts, without disproof from Koehler, that Commerce's "longstanding practice" when making adverse inferences is to "select the higher of: (1) the highest margin stated in the notice of initiation; or (2) the highest margin calculated for any respondent." J.A. 1947.

That is not the end of the inquiry. Commerce must, "to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." 19 U.S.C. § 1677e(c) (2012).[1] Both the authoritative Statement of Administrative Action and a Commerce regulation, in turn, declare that corroborating information means determining that it "has probative value." Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 870, *as reprinted in* 1994 U.S.C.C.A.N. at 4199 ("Corroborate means that the agencies will satisfy themselves that the secondary information to be used has probative value."); 19 C.F.R. § 351.308(d) ("Corroborate means that the Secretary will examine whether the secondary information to be used has probative value.").

The facts of which the figure being corroborated must be "probative" are the facts made relevant by the statute. We said in *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000), that Congress intended an adverse-inference rate "to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance," not an "unreasonably high

---

[1]    Although Congress has recently amended the subsection of 19 U.S.C. § 1677e relating to corroboration of secondary information, that amendment was not retroactive and took effect on June 29, 2015, after Commerce's determination here. Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362; *Ad Hoc Shrimp*, 802 F.3d at 1352.

rate[] with no relationship to the respondent's actual dumping margin," and that Commerce has wide, though not unbounded, discretion "to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin." *Id.* at 1032. We reiterated those points in *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010), while also criticizing Commerce for ignoring the respondent's "commercial reality." *Id.* at 1323–24. Recently, we "clarif[ied] that 'commercial reality' and 'accurate' represent reliable guideposts for Commerce's determinations," but "[t]hose terms must be considered against what the antidumping statutory scheme demands." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1343 (Fed. Cir. 2016). Thus, "a Commerce determination (1) is 'accurate' if it is correct as a mathematical and factual matter, thus supported by substantial evidence; and (2) reflects 'commercial reality' if it is consistent with the method provided in the statute, thus in accordance with law." *Id.* at 1344.

Under those standards, Commerce has satisfied the statute: in particular, the figure it chose has probative value as to the combination of accuracy and deterrence our cases have discussed. The record here includes the data that Koehler submitted in the second administrative review. Commerce, looking at that data, determined that the rate it chose "fell within the range of transaction-specific margins calculated in [the second administrative review]." J.A. 1948. The key graph Koehler relies on shows that, while most sales in that dataset were made with margins between -10% and 30%, one sale showed a margin of almost 50%, and one a margin of 144.63%. Commerce further found that "[t]he margin calculation data from [the second administrative review] is relevant for purposes of corroboration because it is Koehler's own data and thus reflective of its commercial practices." J.A. 1948. In several cases, we have upheld Commerce's use of

a party's own data for corroboration, even where that data represents a small portion of the total sales available and supports a rate that is much higher than rates applied to the respondent in previous segments of the proceeding or to other respondents in the same segment. *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1340 (Fed. Cir. 2009) (upholding a dumping margin of 45.49% based on 29 sales made at margins higher than that, representing 0.5% of PAM's total U.S. sales during a prior period, even after the Court of International Trade had previously remanded that same rate for corroboration because it had looked so high as to be punitive); *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1339 (Fed. Cir. 2002) (upholding a dumping margin of 30.95% based on a single sale made by Ta Chen at that margin representing 0.04% of Ta Chen's sales during that period because "the 30.95% dumping margin is corroborated by actual sales data, and Ta Chen admits that it is reflective of some, albeit a small portion, of Ta Chen's actual sales"). We see no reason for a different conclusion as to the permissibility of Commerce's corroboration determination here.

Koehler argues that the sale in the second administrative review reported with a 144.63% margin was aberrational and so could not be used to corroborate the petition rate. But the mere fact that a margin is unusually high does not mean that it lacks probative value and hence cannot be used for corroboration. *See Nan Ya*, 810 F.3d at 1347 (stating, in the context of applying § 1677e(b), that "[t]he statute simply does not require Commerce to select facts that reflect a certain amount of sales, yield a particular margin, fall within a continuum according to the application of particular statistical methods, or align with standards articulated in other statutes and regulations"); *PSC VSMPO-AVISMA Corp. v. United States*, 755 F. Supp. 2d 1330, 1338 & n.10 (Ct. Int'l Trade 2011) (refusing to treat a sale with unusually low quantity and unusually high freight expenses as an outlier

because Commerce's investigation showed that neither of those factors were correlated to the sale's high margin and explaining that "the fact that this sale has the highest transaction-specific margin by a wide margin . . . in and of itself, does not automatically render the rate aberrational"), *aff'd*, 498 F. App'x 995 (Fed. Cir. 2013). Nor does the fact that the 144.63%-margin sale represents only 0.03% of Koehler's total sales make it improper for Commerce to rely on it. *See PAM*, 582 F.3d at 1340.

What Commerce did with the second-review Koehler data was reasonable. Commerce could assume, as an adverse inference, that Koehler's margins throughout the second administrative review period were artificially depressed because Koehler admitted that it had been engaged in the transshipment scheme during that time as well as the period covered by the third administrative review. The actual rate Commerce adopted (75.36%) was only about half the rate Koehler complains is so aberrational as to be unreliable (144.63%). And the next highest margins in the second-review dataset, which Koehler does not challenge, do not have the single-digit or near-zero rates Koehler urges are appropriate, but consist of one sale made at a 48.68% margin and 18 sales made with margins between 20% and 30%. We note that Commerce is not required to "corroborate corroborating data," *Nan Ya*, 810 F.3d at 1349, but merely satisfy itself that it has probative value.

Our decision in *Gallant Ocean* is not to the contrary. There, we held that Commerce had failed to corroborate the rate it chose because it had failed to "identify any relationship between" the data it used for corroboration and the respondent's actual rate. 602 F.3d at 1324. The *Gallant Ocean* court distinguished *Ta Chen* and *PAM* as cases in which Commerce had tied the rate chosen to the respondents' actual sales. *Id.* at 1324–25. Here, as in *Ta Chen* and *PAM*, Commerce has tied its chosen rate to

Koehler's actual sales, and in doing so has adequately corroborated that rate.

Finally, Koehler complains that the rate is punitive, and therefore statutorily improper, because it is over eleven times higher than the highest calculated rate imposed on Koehler in any prior review. But we have held that as long as a rate is properly corroborated according to the statute, Commerce has acted within its discretion and the rate is not punitive. *KYD, Inc. v. United States*, 607 F.3d 760, 768 (Fed. Cir. 2010) (upholding a rate of 122.88%, sixty-five times higher than any previously calculated rate, because "an AFA dumping margin determined in accordance with the statutory requirements is not a punitive measure, and the limitations applicable to punitive damages assessments therefore have no pertinence to duties imposed based on lawfully derived margins such as the margin at issue in this case"); *Ta Chen*, 298 F.3d at 1340 ("While Commerce may have chosen the 30.95% rate with an eye toward deterrence, Commerce acts within its discretion so long as the rate chosen has a relationship to the actual sales information available.").

C

We see no reversible error in Commerce's refusal to accept Koehler's revised home-market sales data.

1. The refusal does not violate 19 U.S.C. § 1677m(e), which in some circumstances does require consideration of information. Under that provision, Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements" as long as all five requirements listed in that subsection are met. *Id.* Commerce found that Koehler had not met at least three of these requirements—that the information be "submitted by the deadline," that "the information can be verified," and that "the interested party has demonstrated

that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority." Because substantial evidence supports at least one of those findings—indeed more than one—there is no violation of § 1677m(e).

For example, substantial evidence supports Commerce's determination that Koehler has not "demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce]," as required by § 1677m(e)(4). Koehler has admitted that it submitted fraudulent sales data. Although Koehler claims that it did its best because it attempted to correct the data as soon as its "senior management" learned of the misreporting, Commerce was entitled, as discussed above, to hold Koehler responsible for the conduct of its employees. Thus, Koehler's concealment of data shows that it was not acting to the best of its ability. *See Nippon Steel*, 337 F.3d at 1383 ("intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate").

As a second example, substantial evidence also supports Commerce's determination that the information was untimely. While the revised data was submitted on June 27, 2012, the (twice-extended) deadline for response to the supplemental questionnaire, Commerce explained that the supplemental questionnaire had not requested revised data—only that Koehler explain and identify certain seeming discrepancies among its original questionnaire responses. Therefore, as home market-sales data, the revised data should have been submitted by the original deadline for submission of that data, which had passed before the supplemental questionnaire was issued. Koehler does not argue that the supplemental questionnaire requested revised data. Rather, it argues that Commerce implicitly allowed an extension to submit revised data by granting Koehler's motion for an extension of time, because the motion explained that Koehler needed more

time "for counsel to conduct due diligence in connection with the substance of the [transshipment] allegations" and "some of the questions in the Department's supplemental questionnaire concern the same set of facts [as the transshipment allegations]." J.A. 958–59. But Commerce clarified in its final results that it had allowed the extension of time only to the extent that it was necessary to completely and accurately respond to the supplemental questionnaire. Commerce's boilerplate characterization of the reasons in Koehler's request for an extension as "unique circumstances" does not amount to a grant of permission to submit data outside the scope of the initial request.

2.  Koehler also argues that Commerce violated 19 U.S.C. § 1677m(d) in refusing to accept the updated data. We disagree.

The second sentence of the subsection refers to an obligation to accept submitted information in certain circumstances. But it does so only implicitly, in the course of declaring that Commerce has authority to "disregard" information, "subject to subsection (e)." That language invokes the separately stated obligation of § 1677m(e). As just discussed, § 1677m(e) did not oblige Commerce to accept Koehler's data here.

The first, more general sentence of § 1677m(d) states that, where "a response to a request for information under this subtitle does not comply with the request," Commerce must "promptly *inform* the person submitting the response of the nature of the *deficiency* and shall, to the extent practicable, provide that person with an opportunity *to remedy or explain* the deficiency." *Id.* (emphases added). But nothing in that language compels Commerce to treat intentionally incomplete data as a "deficiency" and then to give a party that has intentionally submitted incomplete data an opportunity to "remedy" as well as to "explain." The consequence of such a reading would be to

permit respondents to submit fraudulent data with the knowledge that, should their misconduct come to light, they can demand an opportunity to remedy their intentionally deficient data and avoid the otherwise-authorized adverse inferences. The language of § 1677m(d) does not compel that reading. It permits Commerce not to deem such misconduct to be a "deficiency" or to provide only an opportunity to "explain" (but not "remedy") such misconduct. Here, Commerce did both.

Commerce "emphasize[d]" that "the 'deficiency' at issue did not come about because Koehler inadvertently omitted a number of sales," "due to an unintentional computer programming error," or "because of a misunderstanding of the Department's questionnaire instructions." J.A. 1938. Rather, "[t]he 'deficiency' in Koehler's questionnaire responses occurred because Koehler intended to submit deficient, incomplete, and fraudulent questionnaire responses to the Department." *Id.* Section 1677m(d), which requires Commerce to "inform the person submitting the response of the nature of the deficiency," is readily understood not to apply to the situation here, where Koehler was already aware of and caused the "so-called deficiency." J.A. 1938, 1940 ("Accordingly, we find Koehler's arguments that the Department 'unlawfully denied Koehler an opportunity to remedy its deficiency . . .' to be disingenuous. Koehler did not need the Department to 'promptly inform {Koehler} of the nature of the deficiency.'" (alteration in original)). And in any event, Commerce gave Koehler an opportunity to explain its conduct. Section 1677m(d) was satisfied.

3. Finally, Koehler argues that, even if Commerce had no statutory obligation to consider its updated data, Commerce nevertheless abused its discretion in refusing to accept the data. In several circumstances, we have held that Commerce abused its discretion in refusing to accept updated data when there was plenty of time for Commerce to verify or consider it. *NTN Bearing Corp. v.*

*United States*, 74 F.3d 1204, 1207–08 (Fed. Cir. 1995) (requiring correction of typing errors); *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) (expanding the holding in *NTN* to "any type of importer error—clerical, methodology, substantive, or one in judgment— . . . provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections"). But those cases involved errors quite different from fraud. Here, Commerce did not abuse its discretion in denying Koehler a chance to correct data infected by intentional concealment of relevant information, when the concealment was discovered by another party to the proceeding.

## III

For the foregoing reasons, we affirm the judgment of the Court of International Trade.

**AFFIRMED**